1

2

3

4                         UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7   CYNTHIA S WILLS,                          Case No. 21-cv-01998-EMC

8                      Plaintiff,             **ORDER GRANTING IN PART AND
                                              DENYING IN PART CITY OF
9          v.                                 MONTEREY'S MOTION TO DISMISS,
                                              AND DENYING CITY OF
10  CITY OF MONTEREY, et al.,                 MONTEREY'S MOTION TO STRIKE**

11                     Defendants.            Docket Nos. 76, 78

12

13

14                    I.        **INTRODUCTION**

15          Plaintiff Cynthia S. Wills brings suit against Defendants City of Monterey, Monterey

16  Police Department, and Monterey Harbor Patrol Health (collectively, the "City") for allegedly

17  violating her civil rights.  Ms. Wills alleges that the City violated the Eighth Amendment, the

18  Equal Protection Clause and the Fourteenth Amendment's Right to Travel, and the Due Process

19  Clause of the Fourteenth Amendment.  Ms. Wills also brings state law claims against the City for

20  negligence, intentional infliction of emotional distress, and negligent infliction of emotional

21  distress.

22          Currently pending before the Court are the City's motion to dismiss all of Ms. Wills'

23  claims against it (Docket No. 76), the City's Request for Judicial Notice (Docket No. 77), and the

24  City's motion to strike specific allegations in the Second Amended Complaint ("SAC") (Docket

25  No. 78).  Ms. Wills has opposed all three motions.

26          For the reasons discussed below, the Court **DENIES** the City's motion to dismiss the

27  Eighth Amendment claim because Ms. Wills has plausibly stated a claim under *Martin v. Boise*.

28  Ms. Wills' substantive due process claim under the Fourteenth Amendment is dismissed with

leave to amend.  Should Ms. Wills wish to pursue this claim, Ms. Wills should clearly and concisely describe any encounters with the Monterey Police Department officers and the Seaside homeless man so that the Court can evaluate whether the City's police officers affirmatively engaged in conduct that increased the risk of harm to Ms. Wills.  Ms. Wills' other claims are dismissed with prejudice.  The Court **DENIES** the City's motion to strike as moot.

## II.        FACTUAL AND PROCEDURAL BACKGROUND

Ms. Wills' claims against the City are based on the following allegations in the SAC.  In 2019, Ms. Wills began living out of her car after being unable to find any available accommodation.  SAC (Docket No. 75) at 7.[1]  Ms. Wills attempted to relocate to two neighboring states but returned when she was unable to find housing or other accommodation.  *Id.*  She spent many nights sleeping in her car in Seaside, California.  *Id.*  While she was in Seaside, she encountered several homeless people.  *Id.* at 8.  One of these individuals (whom the SAC does not identify by name) verbally and physically threatened her.  *Id.*  A friend of this man then threatened to set fire to Ms. Wills and her belongings.  *Id.*  After this incident, Ms. Wills spoke to the Seaside Police and decided to leave Seaside and return to Monterey.  *Id.*  The homeless man followed her to Monterey and began stalking her there.  *Id.*  After Ms. Wills reported the stalking to Monterey Police Department ("MPD"), Ms. Wills obtained a restraining order against the homeless man.  *Id.* The man had a long history of drug and alcohol abuse so Ms. Wills feared for her life.  *Id.* at 59.

In the spring of 2019, MPD officers repeatedly refused to enforce the restraining order against the Seaside homeless man who had threatened and stalked her.  *Id.* at 9.  The homeless man followed Ms. Wills on his bicycle, followed her in Del Monte Park, stood behind her in a line at a restaurant, sat at a table fewer than 20 feet from her, and stood closer than 20 feet from her at a library.  *Id.* at 59.  Ms. Wills had many conversations with MPD officers and filed many written complaints with MPD but the officers did not enforce the restraining order.  *Id.* at 9–10.  On one occasion, Ms. Wills told an unidentified MPD officer that the man had come within 20 feet of her.  *Id.* at 60.  Ms. Wills insisted that the MPD officer measure the distance between them, which

---

[1] All citations to the SAC are to the relevant page number.

2

turned out to be 20 feet or fewer.  *Id.*  The MPD officer nonetheless refused to arrest the man.  *Id.*

One night at the Coast Guard after midnight, Ms. Wills was awoken by two men who were outside her tent and were attempting to set it on fire.  *Id.* at 10.  Ms. Wills heard a voice in the distance yelling that "I told you not to go to those feeds [*sic*]."  *Id.*  Ms. Wills understood that this incident was a form of retaliation against her because she had obtained the restraining order.  *Id.*  She reported the incident to MPD but "nothing was done."  *Id.*  Eventually, as Ms. Wills continued to report the restraining order violations, at some point MPD Officer Welch informed Ms. Wills that he had arrested the homeless man.  *Id.*  Although the homeless man ceased to violate the restraining order, his friends then began stalking, threatening, and harassing Ms. Wills.  *Id.* at 11.

In March of 2019, Ms. Wills tried to sleep in a tent in a park in Monterey near Del Monte beach, but MPD officers instructed her not to set up a tent again in the area.  *Id.* at 8–9.  In the spring of 2019, MPD Officers Brian Nino and Scott Collier approached Ms. Wills in a tent on Del Monte Beach in Monterey and told her that if she did not pack up and vacate the tent, she would be arrested.  *Id.* at 9.  Ms. Wills had informed the officers that she had no place else to go.  *Id.*  Officer Nino handed Ms. Wills an eviction notice.  *Id.*  With MPD "harassing" her and with the City of Monterey beachcombers driving by her tent on several occasions to deter campers from staying on the beach, Ms. Wills decided to throw away her tent.  *Id.* at 10.

On several occasions in 2019, MPD officers threatened Ms. Wills with citations for "illegal camping."  *Id.* at 10–11.  On one evening, Ms. Wills reported an incident to MPD where a homeless man and another an unidentified man stood near Ms. Wills while she slept, but MPD did not do anything about the incident and threatened Ms. Wills with a citation for illegally camping.  *Id.* at 11.  On another evening, after reporting a separate incident to MPD that involved an unidentified man, MPD Officers Nino and Collier did nothing but threatened Ms. Wills with a citation for illegally camping.  *Id.*  On another occasion in the spring of 2019, an unnamed MPD officer told Ms. Wills that she should not put up her tent on Del Monte Beach and threatened her with a citation for "illegal camping."  *Id.* at 10.  Ms. Wills alleges that she was told by an unidentified person that it was illegal to camp anywhere in Monterey and that she would be arrested.  *Id.* at 48.

1    MPD officers continued to threaten Ms. Wills with citations after she vacated Del Monte

2    Beach.  *Id.* at 11.  Ms. Wills started to stay at the Custom House near the Monterey Wharf without

3    a tent and MPD Officer Scott Collier told her that if she did not vacate the premises, she would be

4    given a citation for "illegal camping."  *Id.* at 10–11.  Ms. Wills vacated the area and moved to

5    another nearby area.  *Id.* at 11.  Ms. Wills then reported an incident to MPD where an "extremely

6    intoxicated" man approached her while she was sleeping, but MPD "refused to do anything" and

7    told Ms. Wills she could be cited for illegally camping.  *Id.* at 11.  On another evening, MPD

8    Officers Nino and Kris Richardson threatened Ms. Wills with a citation and/or arrest for illegally

9    camping near Cannery Row.  *Id*. at 12.

10    Then, on an evening when Ms. Wills was sleeping at an art gallery nearby with the

11    permission of the gallery director, a Monterey Harbor Patrol ("MHP") security employee

12    approached Ms. Wills and asked her what she was doing.  *Id*. at 13.  Ms. Wills told the MHP

13    employee that she was at the gallery with permission.  *Id.*  The MHP employee stated that he was

14    going to call the MPD.  *Id.*  Shortly thereafter, MPD officers arrived at the scene including

15    Officers Jesse Phillips, Richardson, and Collier.  *Id.*  Ms. Wills informed the officers that she had

16    the permission of the gallery director to be on the premises.  *Id.*  Officer Richardson started yelling

17    "at the top of his lungs" and spitting on Ms. Wills' face.  *Id.*  He repeatedly yelled at Ms. Wills,

18    "Do you want me to throw your dog in the pound?  Do you want me to arrest you?"  *Id.*  Ms. Wills

19    said nothing and stood still while her dog was in the bathroom.  *Id.*  Officer Richardson yelled at

20    Ms. Wills, "Get out now and don't come back or I'll arrest you."  *Id.* at 14.  Ms. Wills left and

21    gave the gallery director back the key she had to the gallery.  *Id*.  Ms. Wills reported the incident

22    to the City of Monterey City Attorney and stated that she would be filing suit against the City of

23    Monterey, MPD, and MHP.  *Id*.  Ms. Wills alleges that these are not the only incidents of

24    harassment from MPD and MHP that she has experienced.  *Id.* at 15.

25    On March 19, 2021, Ms. Wills filed her complaint against the City of Monterey, MPD,

26    Harbor Patrol, and Montage Health.  Complaint (Docket No. 1).  The City and Montage Health

27    subsequently filed separate motions to dismiss.  *See* Montage Health Mot. to Dismiss Compl.

28    (Docket No. 16), City Mot. to Dismiss Compl. (Docket No. 21).  On September 13, 2021, the

4

United States District Court
Northern District of California

1   Court granted the City's motion to dismiss on all claims with leave to amend except for the fourth

2   cause of action, violation of 18 U.S.C. – Deprivation of Rights, which was dismissed with

3   prejudice.  Docket No. 56 (Sept. 13, 2021 Order).

4           On December 23, 2021, Ms. Wills filed an amended complaint ("FAC"), which the City

5   subsequently moved to dismiss.  *See* FAC (Docket No. 62), City Mot. to Dismiss FAC (Docket

6   No. 64).  On April 4, 2022, with a motion to dismiss pending, Ms. Wills filed the Second

7   Amended Complaint ("SAC"), which is the operative pleading in this case.  SAC (Docket No. 75).

8   The City moved to dismiss the SAC and to strike certain allegations contained in the SAC.  Mot.

9   to Dismiss ("MTD") (Docket No. 76); Mot. to Strike (Docket No. 78).  The City also requested

10  that the Court take judicial notice of the Monterey City Code sections that Ms. Wills references in

11  the SAC.  *See* Req. for Judicial Not. (Docket No. 77).  Ms. Wills has opposed all three motions.

12  *See* Opp. to Mot. to Dismiss ("MTD Opp.") (Docket No. 82); Opp. to Mot. to Strike ("Mot. to

13  Strike Opp.") (Docket No. 84); Declaration of Cynthia Wills in Opposition to Request for Judicial

14  Notice ("Wills Decl.") (Docket No. 85).

15                        **III.   LEGAL STANDARD**

16  A.      Motion to Dismiss

17          Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

18  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

19  complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

20  Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

21  after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic

22  Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must

23  . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765

24  F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true

25  and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.

26  Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

27  complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

28  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

1   effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).  "A claim has facial

2   plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

3   inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The

4   plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

5   possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

6   B.    <u>Motion to Strike</u>

7          Before responding to a pleading, a party may move to strike from a pleading any

8   "redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The essential

9   function of a Rule 12(f) motion is to "avoid the expenditure of time and money that must arise

10  from litigating spurious issues by dispensing with those issues prior to the trial."  *Wang v. OCZ*

11  *Tech. Grp., Inc.*, 276 F.R.D. 618, 624 (N.D. Cal. Oct. 14, 2011) (quoting *Whittlestone, Inc. v.*

12  *Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010)).  Motions to strike are generally disfavored.

13  *See Shaterian v. Wells Fargo Bank, N.A.*, 829 F. Supp. 2d 873, 879 (N.D. Cal. 2011); *Platte*

14  *Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004).  A motion to strike

15  should only be granted if the matter sought to be stricken clearly has no possible bearing on the

16  subject matter of the litigation.  *See Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339

17  (N.D. Cal. 1991); *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other*

18  *grounds, Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ("'Immaterial matter' is that which has no

19  essential or important relationship to the claim for relief or the defenses being pleaded.").

20  Statements that do not pertain to, and are not necessary to resolve, the issues in question are

21  impertinent.  *Id.*  If there is any doubt whether the portion to be stricken might bear on an issue in

22  the litigation, the court should deny the motion to strike.  *Platte Anchor Bolt*, 352 F. Supp. 2d at

23  1057.  Just as with a motion to dismiss, the court should view the pleading sought to be struck in

24  the light most favorable to the nonmoving party.  *Id.*

25                          **IV.      DISCUSSION**

26         The Court first considers the arguments raised in the motion to dismiss, then turns to the

27  motion to strike.  In its motion to dismiss, the City argues that Ms. Wills' constitutional claims fail

28  to state a claim upon which relief can be granted and her state law claims fail to allege compliance

1   with California's Government Claims Act and are not actionable against a public entity.  MTD at

2   2.  The Court will begin with Ms. Wills' constitutional claims.

3   A.      Eighth Amendment Claim

4           Ms. Wills asserts that the City violates the Eighth Amendment's cruel and unusual

5   punishment clause by criminalizing homelessness.  SAC (Docket No. 75) at 19.  The City raises

6   three arguments in response.  First, the City contends that Ms. Wills lacks standing to bring her

7   Eighth Amendment claim.  MTD at 12.  Second, the City contends that her claim is barred by the

8   *Heck* doctrine.  *Id.* at 14.  Finally, with respect to the merits of Ms. Wills' claim, the City contends

9   that there is always some public property where individuals may lawfully sleep.  *Id.* at 15.

10          1.      Standing

11          The City asserts that Ms. Wills lacks standing for retrospective relief and that she does not

12   seek prospective relief.  MTD at 13.  Standing to seek prospective relief is analyzed separately

13   from standing to seek retrospective relief.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210

14   (2021) (noting that a plaintiff must "demonstrate standing separately for each form of relief

15   sought" and that "a plaintiff's standing to seek injunctive relief does not necessarily mean that the

16   plaintiff has standing to seek retrospective damages") (citation omitted).  As a result, the Court

17   will consider and separately analyze whether Ms. Wills is seeking retrospective or prospective

18   relief.

19                  a.      The SAC Establishes That Ms. Wills Has Standing for Retrospective Relief

20          To establish Article III standing to challenge the City's code sections, Ms. Wills must

21   show that she has suffered "(1) an injury in fact that (2) is fairly traceable to the challenged

22   conduct and (3) has some likelihood of redressability."  *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902,

23   908 (9th Cir. 2011).  The City appears to argue that Ms. Wills has not suffered an injury in fact

24   because she has not been convicted, arrested, or cited under an anti-camping ordinance.

25          The City cites *Porto* and *Martin* to argue that "in the Ninth Circuit a plaintiff must have

26   been convicted, arrested, or cited under an anti-camping ordinance in order to confer standing."

27   MTD at 13.  This is not an accurate characterization of either case.  While the plaintiffs in *Martin*

28   had been convicted of violating the anti-camping ordinance, *Martin* did not suggest—much less

United States District Court
Northern District of California

7

1   hold—that a conviction or citation is necessary to have standing for retrospective relief.  *Martin v.*

2   *City of Boise*, 920 F.3d 584 (9th Cir. 2019).

3       In *Porto*, the Ninth Circuit considered whether a plaintiff who challenged a city ordinance

4   that criminalized sleeping or camping in public areas had standing to bring claims for prospective

5   relief and damages.  *Porto v. City of Laguna Beach*, 720 F. App'x 853, 854 (9th Cir. 2018).

6   Because the plaintiff was no longer homeless, he lacked standing for his claims for prospective

7   relief.  *Id.*  The court concluded that he lacked standing for his damages claims because he

8   "suffered no injury in fact which [was] fairly traceable to the Anti-Camping Ordinance."  *Id.* at

9   855.  On one occasion, Porto was awoken by an officer who issued him a form marked

10  "Administrative Citation," which stated that Porto had violated the Anti-Camping Ordinance;

11  however, the officer checked the box marked "Courtesy Notice of Municipal Code Violation,"

12  which specified that "[n]o fines are being assessed at this time."  *Id.*  And in response to his

13  allegations that the police sometimes shone lights into his car at night, the court reasoned that

14  "there is no indication that the police were acting pursuant to the ordinance."

15      Here, in contrast, the SAC alleges that MPD officers gave Ms. Wills an eviction notice,

16  harassed, and threatened to cite her.  Unlike *Porto*, Ms. Wills does not simply allege that MPD

17  officers woke her up on one occasion, *Porto*, 720 F. App'x at 855, but that MPD officers

18  repeatedly harassed her and threatened her with citations for camping overnight in violation of

19  City code.  These allegations suffice to state an injury in fact that is fairly traceable to the City

20  code that may be redressed by this suit.  Ms. Wills alleges on several occasions she was forced to

21  move as a result of MPD officers' directives and threats in violation of her rights.  Ms. Wills has

22  standing to bring her Eighth Amendment claim for retrospective relief.

23              b.    The SAC Does Not Establish Standing for Prospective Relief

24      The City argues that the SAC does not seek prospective relief.  MTD at 13; *see also* MTD

25  at 12 (characterizing the SAC as seeking "only retrospective relief regarding her prior interactions

26  with the MPD" and noting that it "does not pray for prospective injunctive or declaratory relief").

27  It is true that Ms. Wills does not explicitly pray for prospective injunctive or declaratory relief.

28  *See* SAC at 24, 70.  But as part of her claim for punitive damages, the SAC asks the Court to

United States District Court
Northern District of California

1   "punish Defendants (all) to reform or deter the Defendants (all) in similar conduct to that which

2   formed the basis for the civil action." *Id.* at 24.  And in the Prayer for Relief, she seeks an award

3   of compensatory and punitive or exemplary damages, as well as "[a]ll other such relief as this

4   Court deems just and proper." *Id.* at 70.  Construed in the light most favorable to Ms. Wills, it is

5   possible that her request "to reform" the MPD could be read as a request for injunctive relief.

6          But even if the Court assumes that Ms. Wills is seeking prospective relief, it is not clear

7   that she faces an "imminent" injury.  As the City points out, even if the Prayer is broadly

8   interpreted to include a request for prospective relief, the SAC does not include any allegations

9   that Ms. Wills is "still homeless or that she continues to reside in the City."  MTD at 13.  Indeed,

10  the SAC alleges that Ms. Willis "is" a resident of Monterey County and "was" a resident of the

11  City of Monterey.  SAC at 2.  Because Ms. Wills has not alleged that she is still homeless, it does

12  not appear that she has standing for prospective relief as currently alleged in the SAC.

13          2.      *Heck* Does Not Bar Ms. Wills' Request for Retrospective Relief

14          The City asserts that Ms. Wills' claims for retrospective relief are barred under the *Heck*

15  doctrine.  MTD at 14.  Under *Heck v. Humphrey*, a Section 1983 constitutional claim that

16  "necessarily" implies the invalidity of the plaintiff's conviction is not "cognizable" unless the

17  conviction was overturned on appeal, collateral review, or executive order.  512 U.S. 477, 486–87

18  (1994).  The *Heck* doctrine thus "serves to ensure the finality and validity of previous

19  convictions."  *Martin*, 920 F.3d at 615.

20          The City's argument hinges on a single conclusory allegation that Ms. Wills was "cited"

21  by the City.  In the first claim for relief, the SAC alleges that "Defendants still cited, threatened

22  and harassed the Plaintiff for sleeping in public . . ."  SAC at 19.  The SAC does not include any

23  other allegations related to this citation, and elsewhere the SAC alleges that Ms. Wills received

24  only warnings and threats of citation.  *Id.* at 10–12.  Assuming that Ms. Wills *did* receive a

25  citation, and *also* assuming that Ms. Wills was subsequently convicted, then *Heck* would apply to

26  the extent that she is seeking damages on a theory that would undermine a conviction that she did

27  not previously challenge.  *See Martin*, 920 F.3d at 613 (concluding that plaintiffs' claims for

28  retrospective relief were barred under the *Heck* doctrine because plaintiffs did not show "that any

1   of their convictions were invalidated via state post-conviction relief"). But "[w]here there is no

2   'conviction or sentence' that may be undermined by a grant of relief to the plaintiffs, the *Heck*

3   doctrine has no application." *Id.* (quoting *Heck*, 512 U.S. at 486–87). Because the SAC does not

4   plausibly allege that Ms. Wills received a conviction of which the validity would be undermined

5   by a judgment in her favor herein, *Heck* does not bar her claims for damages.

6           The Court now turns to the merits of Ms. Wills' Eighth Amendment claim.

7           3.      Prima Facie Eighth Amendment Claim

8           The heart of Ms. Wills' Eighth Amendment claim is that the City criminalizes

9   homelessness because six City Codes allegedly deprive her of any place where she can lawfully

10  sleep. SAC at 37. The SAC first alleges that there are insufficient shelter beds and no non-faith-

11  based shelters for adults. *Id.* at 17–19. The SAC then alleges that "[c]ollectively, Sections 20-85,

12  23-2, 23-3, 32-6, 32-6.1, and 32-6.2 make it unlawful to conduct any life sustaining activity at all

13  day or night therefore explicitly banning necessary functions of any individual." *Id.* at 49. The

14  SAC also alleges that Ms. Wills was told that it was illegal to camp "anywhere" in Monterey and

15  that she would be arrested. *Id.* at 48.

16          Monterey City Code Section 20-85 reads:

17                  No person shall use or occupy, or permit the use or occupancy of,
                    any motor vehicle, recreational vehicle, camp trailer, camper, trailer
18                  coach, or similar vehicles for purposes of sleeping camping or
                    habitation on any street or upon any public property, including any
19                  public parking lot, or upon any private parking lot, between the
                    hours of 10:00 p.m. and 6:00 a.m. except in areas designated for
20                  camping by the City or as otherwise permitted by this City Code.

21  Monterey City Code § 20-85. Monterey City Code Section 23-3 reads:

22                  It shall be unlawful for any person to: (a) Camp, except in
                    designated areas, (b) Camp without first obtaining a permit. At
23                  Veteran's Memorial Park, paying a fee and filling out the required
                    card constitutes a permit, (c) Enter or remain on the premises after
24                  the established closing hours, (d) Picnic, except in designated areas,
                    (e) Operate or park a vehicle in other than designated areas or over
25                  established roads, (f) Burn, kindle, light or maintain any fire during
                    the hours of 10:00 p.m. to 6:00 a.m. or to burn, kindle, light, or
26                  maintain a fire during permitted hours which is not fully contained
                    within City-provided fireplaces or fire rings, or fully contained
27                  within a portable barbecue; or, to dispose of any charcoals, coals,
                    embers, or other residue from a barbecue in any beach area except in
28                  a City-provided fireplace or fire ring . . . . (j) Park or allow any

United States District Court
Northern District of California

1    vehicle to remain in excess of eight consecutive hours, except in
     conjunction with a valid camping permit . . .

2    Monterey City Code § 23-3.  Monterey City Code Section 23-2 includes three relevant definitions

3    for Section 23-3:

4            Camping.  The occupation of any camper, trailer, or other vehicle
             equipped for human habitation, the erection of any tent or other
5            shelter, the arrangement of sleeping bags or bedding for the purpose
             of, or which will permit, remaining overnight. […]
6            Overnight.  The hours between 10:00 P.M. of one day and 6:00
             A.M. of the following day. […]
7            Recreation Area.  All parks, places, greenbelts, gardens, beaches and
             any other property owned by the City, including structures thereon,
8            used, operated or maintained for recreational purposes, whether
             active or passive.
9

10   See Monterey City Code § 23-2.  Monterey City Code Section 32-6 reads:

11           No person shall place any box, bale, package, lumber or other thing
             on any sidewalk by reason of which any sidewalk shall be
12           obstructed; provided that merchants, tradesmen and persons while
             engaged in receiving or forwarding goods or any other commodity
13           may use a portion of the sidewalk in front of where the goods or
             other commodity is to be received or shipped, for a period not
14           exceeding four (4) hours in any one day.  At all times and in all
             instances of such necessary obstructions at least four (4) feet in the
15           clear of such sidewalk so obstructed shall be left free and open to the
             unobstructed use of pedestrians.
16

17   Monterey City Code § 32-6.  Monterey City Code Section 32-6.1 reads:

18           It shall be unlawful for any person or group of persons to
             intentionally obstruct or impede the free movement of any
19           pedestrian or vehicle, or any group of pedestrians or vehicles within,
             on, in, or upon any public street, sidewalk, way, path, park, wharf,
20           parking lot, or other public property within the City of Monterey,
             including the ingress or egress of such pedestrian or vehicular traffic
21           from private property, the entrances to or from which abut any such
             public street, sidewalk, way, path, park, wharf, parking lot or other
22           public property.

23   Monterey City Code § 32-6.1.  Finally, Monterey City Code Section 32-6.2 reads in part that:

24           Sitting on Commercial Sidewalks at Certain Times Prohibited.  No
             person shall sit or lie on a commercial sidewalk or on any object
25           brought or affixed to such sidewalk, from 7:00 a.m. until 9:00 p.m.,
             except as provided in this section.
26

27

28

                                            11

1  Monterey City Code § 32-6.2 (emphasis in original).[2]

2        "[T]he Eighth Amendment prohibits the imposition of criminal penalties for sitting,

3  sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter."

4  *Martin*, 920 F.3d at 616.  Under *Martin*, the Eighth Amendment's prohibition on cruel and

5  unusual punishment bars a city from prosecuting people criminally for sleeping outside on public

6  property when those people have no home or other shelter to go to.  *Id.* at 603.  But *Martin*'s

7  holding was narrow—it did not "dictate to the City that it must provide sufficient shelter for the

8  homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any

9  place."  *Id.* at 617 (citation omitted).  *Martin* noted that "an ordinance prohibiting sitting, lying, or

10  sleeping outside at particular times or in particular locations might well be constitutionally

11  permissible," as well as "an ordinance barring the obstruction of public rights of way or the

12  erection of certain structures."  *Id.* at 617 n.8.

13        The key question under *Martin*, then, is whether the ordinances collectively criminalize

14  sleeping outside *anywhere* in the City (particularly in the evening, the normal sleeping period for

15  most people), or whether the ordinances merely criminalize sleeping in certain areas within the

16  City.  *See Sausalito/Marin Cnty. Chapter of California Homeless Union v. City of Sausalito*, No.

17  21-cv-01143-EMC, 2021 WL 5889370, at *2 (N.D. Cal. Dec. 13, 2021) ("*Martin* prohibits a ban

18  on all camping, not the proper designation of permissible areas."); *Gomes v. Cnty. of Kauai*, 481

19  F. Supp. 3d 1104, 1109 (D. Haw. 2020) (dismissing complaint that alleged that Defendants

20  criminalized sleeping in one public park because it did not show that "Plaintiffs could not sleep in

21  other public places within the County of Kauai"); *cf. Blake v. City of Grants Pass*, No. 18-cv-

22  01823, 2020 WL 4209227, at *8 (D. Or. July 22, 2020) ("Because Grants Pass lacks adequate

23  shelter for its homeless population, its practice of punishing people who have no access to shelter

24  for the act of sleeping or resting outside while having a blanket or other bedding to stay warm and

25

26  _____

27  [2] On April 15, 2022, the City requested that the Court take judicial notice of the Monterey City
Code sections at issue in the SAC.  *See* Docket No. 77.  Ms. Wills submitted a declaration
objecting to the City's request, but her declaration does not explain why she is objecting.  Because

28  the code sections are matters of public record not subject to dispute, the City's request is
**GRANTED**.  *See MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

United States District Court
Northern District of California

dry constitutes cruel and unusual punishment in violation of the Eighth Amendment.").

The City contends that Ms. Wills' claim fails because the code sections do not criminalize sleeping outside in *all* public places in the City at all times. MTD at 15. According to the City, there are always portions of public property in the City on which individuals may lawfully sleep. *Id.* First, because the anti-camping ordinances only restrict overnight camping, the City argues that people may camp and sleep during the day (from 7:01am to 9:59pm) in public recreational areas. *Id.* Second, the City focuses on Section 32-6.2 (which only applies from 7am to 9pm) to suggest that people may sleep on sidewalks overnight. *Id.* ("[S]ection 32-6.2 . . . only applies from 7am until 9pm"); Reply (Docket No. 88) at 3 ("[S]ection 32-6.2 does not apply to sidewalks in residential areas of the City.").

Construing all allegations of fact in the light most favorable to Ms. Wills, the Court concludes that the SAC states a claim under the Eighth Amendment. First, the Court takes issue with the City's position that public areas which are available during the daytime may suffice under *Martin*. The vast majority of individuals sleep during the evenings, not during daylight hours. The Court will not countenance that a city may constitutionally criminalize sleeping outside during the evenings so long as it provides some public space that is available during daytime hours. *Martin* cannot and does not stand for such a proposition.

Second, it is not evident to the Court that there are places that Ms. Wills may sleep outside during the evenings. Sections 23-2 and 23-3 prevent her from erecting a tent or using a sleeping bag in the City's residential areas, which is broadly defined to include "[a]ll parks, places, greenbelts, gardens, beaches and any other property owned by the City, including structures thereon, used, operated or maintained for recreational purposes, whether active or passive." *See* Monterey City Code §§ 23-2 and 23-3. Notably the term "camping" is broadly defined in § 23-3. Sections 32-6 and 32-6.1 call into question whether people may lawfully sleep or camp on commercial or residential sidewalks at night. Section 32-6, which provides that people cannot place any "box, package, lumber or other thing on any sidewalk by reason of which any such sidewalk shall be obstructed," presumably bars tents or bedding on sidewalks. Monterey City Code § 32-6. And Section 32-6.1 makes it unlawful for any person to "intentionally obstruct or

1   impede the free movement of any pedestrian" on any sidewalks, which plausibly bar sleeping on a

2   sidewalk.  The City characterizes these sections as "directed to the entire obstruction of a

3   sidewalk," MTD at 17, but by their express terms, these code sections do not contain any such

4   limitation.

5       During the hearing, the City argued that Ms. Wills' concerns were hypothetical because the

6   City does not enforce all of the ordinances that Ms. Wills cited in the SAC.  This assertion is

7   belied by the SAC, which alleges that MPD officers repeatedly threatened Ms. Wills with citations

8   for sleeping outdoors in different areas of the City.  *See, e.g.*, SAC at 11–12 (describing an

9   encounter with an MPD officer at the Custom House who threatened her with a citation for illegal

10  camping); *id.* at 12 (describing an encounter with two MPD officers on Cannery Row who told

11  Ms. Wills that she was illegally camping and threatened to arrest her).

12      In sum, after accepting all of the SAC's allegations as true, and construing them in the

13  light most favorable to Ms. Wills, the Court concludes that Ms. Wills has stated an Eighth

14  Amendment claim at this juncture.  The Court **DENIES** the City's motion to dismiss this claim.

15  B.      Equal Protection Claim – Right to Travel

16      Ms. Wills alleges that the City violated the Equal Protection Clause and her right to travel

17  under the Fourteenth Amendment.  SAC at 39.  Confusingly, the SAC also alleges that Ms. Wills

18  "traveled to and from Monterey several times" and "traveled in and out of the state of California."

19  *Id.*

20      Under the Equal Protection Clause, "[n]o State shall make or enforce any law which shall

21  abridge the privileges or immunities of citizens of the United States; nor shall any State deprive

22  any person of life, liberty, or property, without due process of law; nor deny to any person within

23  its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  The right to travel is a

24  constitutional right protected by the Fourteenth Amendment that permits individuals to move from

25  one place to another.  *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999).  However, neither the

26  Ninth Circuit nor the Supreme Court have recognized the right of *intrastate* travel.  *See Nunez by*

27  *Nunez v. City of San Diego*, 114 F.3d 935, 944 n.7 (9th Cir. 1997).

28      Moreover, to allege a violation of the Equal Protection Clause on the basis of alleged

14

discrimination, a plaintiff must show that a defendant acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class. *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Where a challenged governmental policy under the Equal Protection Clause is "facially neutral," proof of its disproportionate impact on an identifiable group "can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Laws that do not burden a protected class or infringe on a constitutionally protected fundamental right are subject to rational basis review. *Romer v. Evans*, 517 U.S. 620, 631 (1996). Under rational basis review, the law will be upheld so long as it bears some rational relation to some legitimate end. *Id.* But where a challenged governmental action classifies by race, alienage, or national origin, it is subjected to "strict scrutiny" and "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

The City alleges that the code sections at issue are rationally related to the "promotion of sanitary and safe conditions within the City," so Ms. Wills fails to state an equal protection claim based on her status as a homeless person. MTD at 18. The Court agrees with the City. The code sections do not facially discriminate on the basis of a suspect classification: they do not classify individuals by "race, alienage, or national origin." *City of Cleburne*, 473 U.S. at 440. As such, the codes are subject to rational basis review. *Romer*, 517 U.S. at 631. Ms. Wills failed to allege that these code sections lack some rational relationship to a legitimate end under rational basis review, subject to the potential violation of the Eighth Amendment discussed above. *Romer*, 517 U.S. at 631.

The Court had previously dismissed Ms. Wills' claim under the Equal Protection Clause with leave to amend so that she could allege how the codes fail to bear some rational relation to a legitimate end. Order at 22. Because Ms. Wills still has not done so, the Court dismisses the right to travel claim with prejudice.

C.     Substantive Due Process – State-Created Danger

Ms. Wills alleges that the City violated her Fourteenth Amendment right to substantive due

15

process by placing her in a known danger with deliberate indifference to her safety.  SAC at 39–

41.  In general, a state is not required to protect individuals from third parties.  *Morgan v.*

*Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007) ("[T]he general rule is that the Fourteenth

Amendment does not impose a duty on government officers to protect individuals from third

parties.").  But there are two exceptions to this general rule.  "First, a special relationship between

the plaintiff and the state may give rise to a constitutional duty to protect."  *Martinez v. City of*

*Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019).  "Second, the state may be constitutionally required

to protect a plaintiff that it "affirmatively places . . . in danger by acting with 'deliberate

indifference' to a 'known or obvious danger.'"  *Id.* (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965,

971–72 (9th Cir. 2011)).  Ms. Wills' claim is predicated on the second exception.

      To state a substantive due process claim based on a state-created danger, Ms. Wills must

establish three elements.  "First, she must show that the officers' affirmative actions created or

exposed her to an actual, particularized danger that she would not otherwise have faced.  Second,

she must show that the injury she suffered was foreseeable.  Third, she must show that the officers

were deliberately indifferent to the known danger."  *Martinez*, 943 F.3d at 1271 (citation omitted).

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action."  *Patel*, 648 F.3d at 974 (quoting

*Bryan Cnty. v. Brown,* 520 U.S. 397, 410 (1997)).  The Ninth Circuit has explained that deliberate

indifference requires that the state actor "knows something *is* going to happen but ignores the risk

and exposes [the plaintiff] to it."  *Id.* at 974 (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir.

1996)) (emphasis in original).

      The SAC articulates two independent theories under which the City endangered Ms. Wills.

First, the SAC alleges that by threatening citations for illegal camping and "forcing Plaintiff to

hide from the visibility of other people," the City subjected Ms. Wills to the general threat of other

homeless people.  *Id.* at 40.  Second, the SAC alleges that the City did not enforce a restraining

order against a particular individual.  *Id.* at 40–41.

1.     <u>The SAC Does Not Allege a State-Created Danger Arising from MPD's Enforcement of the City Code</u>

The first prong of *Martinez* requires the SAC to show that the MPD's affirmative actions created or exposed Ms. Wills to an actual, particularized danger that she would not otherwise have faced. *Martinez*, 943 F.3d at 1271. Ms. Wills' theory is that by threatening citations and "forcing her to hide from the visibility of other people," MPD "subjected her to the threats of other homeless individuals." SAC at 40. Ms. Wills has already shown that there was nowhere for her to lawfully camp in Monterey. *See* Eighth Amendment section above. Even so, though, the Substantive Due Process claim fails because Ms. Wills has not shown that she was exposed to a danger that she would not have otherwise faced.

As alleged in the SAC, Ms. Wills was threatened by other homeless people in several locations in Monterey, including at the Coast Guard, on a bench at the Custom House, and in an area near to the Custom House. *See* SAC at 10–11. The SAC does not allege that Ms. Wills was "hiding" from MPD officers during these incidents—to the contrary, it appears that she was in a relatively public place (*i.e.*, sleeping on a bench) at the time of these encounters. The SAC thus does not causally connect these interactions with the MPD's enforcement of the anti-camping ordinances.

The caselaw is clear that to state a state-created danger claim, the state actor must affirmatively do something that "make[s] the situation worse" for the plaintiff. *Martinez*, 943 F.3d at 1272. In *Sanchez v. City of Fresno*, for instance, the court found that plaintiff stated a cognizable claim where the City of Fresno allegedly timed the demolitions of "plaintiff's shelter and property essential to protection from the elements" to occur at "the onset of the winter months that would bring cold and freezing temperatures, rain, and other difficult physical conditions." *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1100 (E.D. Cal. 2012).

In *Cobine v. City of Eureka*, plaintiffs alleged the City's forced eviction from an encampment and prohibition against residing in their own tents and makeshift shelters in their own encampment on public land caused them to reside and sleep "on the street in unfamiliar areas, and without the support of the community, render[e]d them vulnerable to assault, theft, harassment,

and worse." *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017). *Cobine* found that plaintiffs had not stated a plausible state-created danger claim:

> In the absence of particular allegations that the state action put the Plaintiffs in an inherently dangerous situation, the Court is bound to find that the generalized dangers of living on the street preexisted Plaintiffs' relocation from the Palco Marsh. From the allegations in the amended complaint, it appears that the encampment residents were permitted to sleep in a City-owned parking lot or were offered temporary emergency shelter accommodations. (*See id.* at ¶¶ 202, 203.) The current circumstances are certainly not ideal, but the Court finds they do not amount to a deliberate indifference of placing Plaintiffs in an inherently more dangerous situation than they had faced previously. The general circumstances of being homeless in Humboldt County cannot be minimized. Without allegations of intentional eviction during precarious weather or other facts indicating deliberate indifference to the safety and welfare of the population, the Court must dismiss the claim.

*Id.* at 433; *see also Hous. is a Hum. Right Orange Cnty. v. Cnty. of Orange*, No. 19-cv-388, 2019 WL 6481311, at *12 (C.D. Cal. Aug. 12, 2019) (rejecting claim where "Plaintiffs have not sufficiently alleged well-pleaded facts plausibly suggesting that the City has taken the type of affirmative steps to place an individual in a known and likely danger to satisfy the deliberate indifference standard . . . [a]dditionally, the difficulties the homeless individuals camping at the temporary campground may face are largely identical to those they would face while camping elsewhere in the City").

Because the SAC has not established that the MPD's enforcement of the code sections exposed Ms. Wills "to a danger which she would not have otherwise faced," this theory does not allege a state-created danger. And because of the pre-existing danger that Ms. Wills experienced from other homeless people, the state-created danger doctrine does not apply. The Court dismisses the theory of a state-created danger based upon MPD's enforcement of the city code sections with prejudice.

2.     <u>The SAC Does Not Allege A State-Created Danger Based On the Restraining Order</u>

Ms. Wills' second theory is that MPD's failure to enforce the restraining order against the Seaside homeless man gave rise to a state-created danger. *See* SAC at 60 ("MPD put Plaintiff in more danger by refusing to arrest him, which led him to believe that he could get away with

United States District Court
Northern District of California

1    harassment and stalking.").

2           The question here is whether MPD exhibited "affirmative conduct" that created or exposed

3    Ms. Wills to an actual, particularized danger that she otherwise would not have faced.  *Martinez*,

4    943 F.3d at 1271.  As the City points out, generally a failure to enforce a restraining order or to

5    arrest a person does not, on its own, constitute affirmative conduct.  *See id.* at 1272 ("[F]ailing to

6    make an arrest . . . [is] not an affirmative act that created an actual, particularized danger.")

7    (cleaned up); *Cardenas v. Cnty. of Tehama*, 476 F. Supp. 3d 1055, 1066 (E.D. Cal. 2020) ("[T]he

8    officers' failure to enforce the restraining orders or follow up directly with Neal regarding the

9    complaints against him are examples of inaction, not affirmative conduct, and are insufficient to

10   state a claim under the state created danger theory.").  MPD's mere failure to enforce the

11   restraining order, alone, cannot serve as the basis for Ms. Wills' state-created danger claim.

12          On the other hand, though, courts have recognized this theory when the officer's failure to

13   make an arrest is accompanied by some other conduct that could be seen as encouraging or

14   condoning the assailant's actions.  In *Martinez*, for example, an officer exhibited actionable

15   affirmative conduct by failing to arrest a domestic violence abuser *and* praising the abuser in the

16   abuser's presence.  *Martinez*, 943 F.3d at 1273.  The Ninth Circuit found that such remarks placed

17   the victim in greater danger because the abuser may have felt "emboldened to continue his abuse

18   with impunity."  *Id.*  Likewise, in *Armstead*, the court found that Oakland police officers plausibly

19   created an actual, particularized danger when they repeatedly told the plaintiff "within earshot" of

20   the assailant that they were "understaffed and overworked and their calls were not a high priority"

21   because "this conveyed to [the assailant] that he could continue to harass the Armsteads."

22   *Armstead v. Cnty. of Alameda*, No. 21-cv-05257-LB, 2022 WL 888660, at *4 (N.D. Cal. Mar. 26,

23   2022).  On another occasion, the assailant threw a rock through the Armsteads' front window,

24   hitting and injuring Mrs. Armstead, who was then transported by ambulance to the hospital for her

25   serious injuries.  *Id*.  The police responded to the scene, did not arrest the assailant for felony

26   assault or any crime, did not question him, and again within earshot of the assailant, told Mrs.

27   Armstead that they would not take any action.  *Id*.

28          Under *Martinez* and *Armstead*, then, MPD officers plausibly may have engaged in

United States District Court
Northern District of California

19

"affirmative conduct" if the MPD officers encouraged or condoned the homeless man's actions. According to the SAC, although the MPD was summoned "between six and twelve times" over the homeless man's alleged violation of the restraining order, MPD officers repeatedly refused to arrest him.  SAC at 59; *see also id.* at 9–11 and 59–60 (describing various interactions that Ms. Wills had with the homeless man).  The SAC also alleges that "[t]he Defendants [*sic*] failure to enforce that Restraining [*sic*] the Plaintiff contends led the man to believe that he could threaten her by attempting to set her tent on fire in the early morning hours while she slept in her tent."  *Id.* at 65.  Additionally, the SAC alleges that "[t]he MPD put Plaintiff in more danger by refusing to arrest him, which led him to believe that he could get away with the harassment and stalking."  *Id.* at 60.  Under *Armstead*, such allegations—should they be supported by sufficient factual detail elsewhere in the SAC—could state a claim.

The closest that the SAC comes to providing sufficient factual detail is with an incident involving a tape measure.  The SAC alleges that "[o]n one occasion Wills told MPD that the man had come within 20 feet of her and MPD said it wasn't 20 feet, and Wills asked MPD to measure the distance with a measuring device.  MPD complied after Wills insisted, and it was indeed 20 feet or less and still MPD refused to arrest the man."  *Id.* at 60.  This allegation supports this theory because it puts Ms. Wills, the homeless man, and an MPD officer together temporally and geographically.  If the homeless man perceived the MPD officers refused to take action in the face of a conceded violation as determined by the officers, along with other willful failures to take action in the face of a clear violation of law, this could be construed as affirmatively encouraging continued misconduct.  However, it is not clear that an MPD officer was present with Ms. Wills and the homeless man on other occasions. Without that temporal and spatial link, the officers' refusal to enforce the restraining order cannot plausibly be seen as encouraging or condoning the harassment.

In sum, the SAC does not contain sufficient factual allegations that could give rise to a state-created danger claim based upon MPD's failure to enforce a restraining order.  But because that it is possible that Ms. Wills could provide the requisite factual support, Ms. Wills is given leave to amend this claim.

D.      State Law Claims

Ms. Wills also brings three state common law claims for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress.  SAC at 61–69.  She seeks money damages.  *Id.* at Prayer.  The City argues that these claims should be dismissed because Ms. Wills has purportedly failed to comply with the California Government Claims Act.  MTD at 21–23.

Under the Government Claims Act, set forth in California Government Code sections 810 *et seq.*, a plaintiff may not bring a suit for monetary damages against a public employee or entity unless the plaintiff first presented the claim to the public entity.  *See* Cal. Gov. Code § 945.4.  The purpose of this requirement is "to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation." *City of San Jose v. Superior Court*, 12 Cal.3d 447, 455 (1974) (citations omitted).  Compliance with this "claim presentation requirement" is mandatory.  *State v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1244 (2004); *Rubenstein v. Doe No. 1*, 3 Cal. 5th 903, 906 (2017), *as modified on denial of reh'g* (Nov. 1, 2017) ("Compliance with the claim requirement is a condition precedent to suing the public entity.").  Failure to demonstrate such compliance constitutes a failure to state a cause of action and will result in the dismissal of state law claims.  *Bodde*, 32 Cal. 4th at 1240.

The Government Claims Act contains strict time limitations: a claim relating to a cause of action for an injury to a person shall be presented no later than six months after the accrual of the cause of action, and a claim relating to any other cause of action shall be presented not later than one year after the accrual of the cause of action.  Cal. Gov. Code § 911.2(a).  The Government Claims Act also requires that certain information be included in the written notice, including "the date, place, and other circumstances of the occurrence or transaction which gave rise to the claim asserted."  *See* Cal. Gov. Code § 910 ("A claim shall be presented . . . and shall show all of the following . . . ").

Under California's pleading standard against a public entity under the Government Claims Act, "a plaintiff must allege facts demonstrating or excusing compliance with the claim presentation requirement.  Otherwise, his complaint . . . fail[s] to state facts sufficient to constitute

1    a cause of action."  *Bodde*, 32 Cal. 4th at 1243; *Robinson v. Alameda Cnty.*, 875 F. Supp. 2d 1029,

2    1043 (N.D. Cal. 2012).

3              The Court previously dismissed Ms. Wills' state law claims because she did not allege that

4    she filed a timely written claim with the City as required by the Government Claims Act.  Order at

5    23.  The Court dismissed her claims with leave to amend so that Ms. Wills could allege "whether

6    and how she complied with the Government Claims Act."  *Id.* at 24.

7              In the SAC, Ms. Wills alleges that she "sent written claims by mail against the city and her

8    intent to bring Civil Action [and] never heard from the City of Monterey.  As such Plaintiff was

9    not required to comply with the Government Claims Act in reference to her Civil Rights claims as

10   generally governmental tort immunities recognized by state law cannot override liabilities created

11   by the federal Civil Rights Act."  SAC at 69.  The City contends that these allegations are

12   insufficient because the SAC "does not allege any dates of compliance with the specific deadlines

13   of the California Government Claims Act and provides no basis for the Court to determine

14   whether the alleged compliance is sufficient."  MTD at 22.  The City also objects that the SAC

15   "fails to allege to what agency person any claim was submitted or to provide any copy, content, or

16   description of the contents of the claim."  *Id.* at 23.  Ms. Wills does not respond to these arguments

17   in her opposition brief.

18             Courts have dismissed claims for failure to allege compliance with the California

19   Government Claims Act.  *See, e.g.*, *AHCS - Mental Health & Wellness Inc. v. Los Angeles Cnty.*,

20   No. 21-cv-7694, 2021 WL 6495038, at *7 (C.D. Cal. Dec. 16, 2021) ("Given that Plaintiff has not

21   alleged more than a conclusory assertion that Navitus was Defendant's 'designee,' the Court finds

22   that Plaintiff did not comply with the California Government Claims Act and grants Defendant's

23   Motion to Dismiss for this reason."); *Payan v. Tate*, No. 13-cv-00807, 2017 WL 880421, at *4

24   (E.D. Cal. Mar. 6, 2017) ("Plaintiff's conclusory allegation in the proposed supplemental

25   complaint that 'Plaintiff filed government claim action and exhausted all the issues to this claim'

26   does not warrant amendment.  Plaintiff failed to allege any facts that he complied with the

27   California Government Claims Act."); *Jones v. Cnty. of San Diego*, No. 20-cv-1989, 2021 WL

28   4460788, at *6 (S.D. Cal. Sept. 29, 2021) ("Here, the FAC summarily alleges that he filed a claim

United States District Court
Northern District of California

1   as required by section 911.2 but his claim was denied . . . This summary allegation does not

2   sufficiently assert compliance with the claim presentment procedure that sets out specific

3   deadlines.  In the FAC, Plaintiff fails to provide any specifics dates as to his claim history in order

4   for the Court to determine whether he has alleged compliance with the Government Claims Act.

5   Accordingly, the Court grants Defendant's motion to dismiss for failing to allege compliance with

6   the Government Claims Act.").

7   Because the SAC has not provided sufficient factual support to show compliance with the

8   California Government Claims Act, the Court will dismiss the state law claims.  Because the Court

9   already gave Ms. Wills leave to amend previously and Ms. Wills still has not shown compliance

10   with the Government Claims Act, these claims are **DISMISSED** with prejudice.

11   E.    Motion to Strike

12   The City asserts that the Court should strike thirty-two allegations in the SAC that contend

13   or bear on the City having "a duty to enforce restraining orders against third persons for the

14   benefit of Plaintiff and a duty to generally 'protect her' from other homeless persons and the

15   dangers they might pose."  Mot. to Strike at 7, 13–21.  According to the City, such allegations are

16   redundant, immaterial, and impertinent because government and police entities have no such duty.

17   *Id.* at 7, 10.  As a result, the City contends that these allegations do not support or relate to any

18   cause of action, and should be stricken as a matter of law before the parties are prejudiced with the

19   time, expense, and confusion of conducting discovery, preparing further motions, and litigating

20   such issues.  *Id.* at 7.

21   The Court has granted the City's motion to dismiss the SAC for every claim except for the

22   Eighth Amendment claim.  As a result, it **DENIES** the City's motion to strike as moot.

### V.    CONCLUSION

24   For the foregoing reasons, the Court **GRANTS** the City's motion to dismiss the SAC's

25   claims under the Fourteenth Amendment and state law.  The Court **DENIES** the City's motion to

26   dismiss the Eighth Amendment claim.  The City's motion to strike is **DENIED** as moot.

27   ///

28   ///

23

1         Should Ms. Wills wish to pursue her Fourteenth Amendment Substantive Due Process

2    claim, she must file an amended complaint by or before September 12, 2022.

3         This order disposes of Docket Nos. 76 and 78.

4

5         **IT IS SO ORDERED**.

6

7    Dated: August 1, 2022

8

9    _____

10   EDWARD M. CHEN
     United States District Judge